Christopher H. Baker, Esq.
Arkansas Bar No. 2022124
Attorney for Aaron Nichols
James Law Firm
1001 La Harpe Blvd.
Little Rock, Arkansas 72201
Telephone: (501) 375-0900
Email: Chris@Jamesfirm.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case:   4:22-CR-00300-JM-24 |
| Plaintiff(s) | ) | |
| v. | ) | |
| | ) | |
| Aaron Nichols | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

**DEFENDANT AARON NICHOLS' BRIEF IN SUPPORT**

**OF THE MOTION PRETRIAL RELEASE IN PRESUMPTION CASES**

COMES NOW, the Defendant, Aaron Nichols, by and through his undersigned counsel, Christopher Henry Baker of the James Law Firm, and submits the following brief in support of the Motion for Pretrial Release in Presumption Cases.

## Table of Contents

Table of Contents ...................................................................................................... i

BRIEF IN SUPPORT OF MOTION FOR PRETRIAL RELEASE IN PRESUMPTION CASE.... 1

CONSCISE STATEMENT OF FACTS ...................................................................... 1

I.    THE STATUTORY PRESUMPTIONS OF DETENTION SHOULD BE VIEWED
WITH CAUTION BECAUSE THEY LEAD TO HIGH RATES OF DETENTION FOR
LOW-RISK DEFENDANTS................................................................................... 2

   A.  Pre-Trial Detention Condemns Struggling Families to a Life of Hardship ........................ 5

   B.  Detention of Mr. Nichols Will Forever Damage Familial Ties........................................ 8

   C.  Aaron Nichols Should Be Released on Bond with Conditions. ....................................... 11

II.  THE PRESUMPTION OF DETENTION CAN BE EASILY REBUTTED AND, ONCE
REBUTTED, MUST BE CONSIDERED ALONGSIDE ALL OF THE EVIDENCE THAT
WEIGHS IN FAVOR OF RELEASE. .................................................................. 12

   A.  Rebutting the Presumption is a Minor Burden ................................................. 13

   B.  Weighing the Rebutted Presumption ............................................................ 14

   C.  Forbidden Considerations in a Presumption Case ............................................. 15

III.   THE PRESUMPTION OF DETENTION IS REBUTTED IN THIS CASE................. 15

   A.  Mr. Nichols Has Deep Roots In Arkansas ........................................................ 16

   B.  Mr. Nichols Is Not Sitting Idly Unemployed.................................................... 16

   C.  Mr. Nichols Needs to Work and Doesn't Have Resources to Abscond ........................... 16

   D.  Mr. Nichols' Past Is Dissimilar To Those Who Should Be Detained ............................. 17

   E.  Preparing to Defend Your Castle is a Lawful Response to a Midnight Invasion............... 18

   F.  A Single Failure To Appear Does Not Accurately Reflect Mr. Nichols Ability and
       Commitment To Appear Before This Court. .................................................... 19

G.  Mr. Nichols Needs Treatment Not Detention.............................................................20

IV.    REGARDLESS OF THE PRESUMPTION, AARON NICHOLS MUST BE
RELEASED BECAUSE THERE ARE CONDITIONS THAT WILL REASONABLY
ASSURE APPEARANCE AND SAFETY. ....................................................................20

V.    STATISTICS SHOWING THAT IT IS EXTRAORDINARILY RARE FOR
DEFENDANTS ON BOND TO FLEE OR RECIDIVATE FURTHER DEMONSTRATE
THAT THE FOREGOING CONDITIONS OF RELEASE WILL REASONABLY ASSURE
APPEARANCE AND SAFETY. ................................................................................... 21

VI.    A Logical Conclusion Follows: Mr. Nichols Should Not Be Detained............................24

APPENDIX 1 ....................................................................................................................... 25

AO TABLE H-15 (Dec. 31, 2019) ................................................................................... 25

APPENDIX 2 ....................................................................................................................... 26

AO TABLE H-14A (Dec. 31, 2019) ................................................................................ 26

APPENDIX 3 ....................................................................................................................... 27

AO TABLE H-3 (Sept. 30, 3019) .................................................................................... 27

Cases

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................................ 19

*Stack v. Boyle*, 342 U.S. 1 (1951) ...................................................................................... 12

*United States v. Abad*, 350 F.3d 793 (8th Cir. 2003)..................................................... 13, 15

*United States v. Alatishe*, 768 F.2d 364 (D.C. Cir. 1985) .................................................. 14

*United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992).......................................................... 12

*United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985) ............................................. 15

*United States v. Cirksena*, 749 F. App'x 488 (8th Cir. 2019) ............................................ 18

*United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986)..................................... 14, 16, 21

*United States v. Gamble*, No. 20-3009 (D.C. Cir. Apr. 10, 2020) ..................................... 13

*United States v. Jessup*, 757 F.2d 378 (1985)............................................................... 14, 15

*United States v. Kisling*, 334 F.3d 734 (8th Cir. 2003) ................................................. 16, 22

*United States v. Mercedes*, 254 F.3d 433 (2d Cir. 2001) .............................................. 13, 16

*United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ..................................................... 14

*United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) ........................................................ 12

*United States v. Salerno*, 481 U.S. 739 (1987)................................................................... 1

*United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987) ...................................................... 12

Statutes

18 U.S.C.S. § 3142(c)(1)(B) ............................................................................................. 22

18 U.S.C.S. § 3142(g) .................................................................................................. 15, 16

18 U.S.C.S. § 3142 ................................................................................................... passim

18 U.S.C.S. § 3142(c)(1)................................................................................................ 11, 22

18 U.S.C.S. § 3142(e) ....................................................................................................... 22

18 U.S.C.S. § 3142(e)(3)....................................................................................................11

A.C.A. § 5-2-607 .................................................................................................. 19

A.C.A. § 5-2-620 .................................................................................................. 19

A.C.A. § 5-73-103 ................................................................................................ 20

Other Authorities

S. Rep. No. 98-225................................................................................................ 11

Constitutional Provisions

Ark. Const. art. ii, § 5........................................................................................... 19

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR PRETRIAL RELEASE IN PRESUMPTION CASE

Defendant Aaron Nichols, through his attorney, Christopher Baker of the James Law Firm, respectfully requests that this Court release him on with or without conditions of bond pursuant to the Bail Reform Act, 18 U.S.C. § 3142; *United States v. Salerno*, 481 U.S. 739 (1987); and *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985).

## STATEMENT OF FACTS

Mr. Nichols was initially brought before this court on November 14, 2022. At this initial appearance, the government requested detention of Mr. Nichols. Immediately following that, Mr. Nichols requested a continuance and noticed the Government with a demand for a discovery. On November 21, 2022, Counsel for Mr. Nichols discussed potential release conditions with the Government in person. Later that evening, at 8:02 p.m., a 3rd party release plan was submitted to both the Government and the Probation office. Counsel for Mr. Nichols last heard from the Government on November 23, 2022 and have not been able to come to an agreement at the time of filing this motion.

With time ticking away, Mr. Nichols now finds himself less than 48 hours away from a pretrial detention hearing that could effectively confine him for years to come despite his presumption of innocence. After multiple attempts to confer, the Government's final position on Mr. Nichols' release remains unknown. Years of pre-trial confinement loom over Mr. Nichols. With this dark cloud swirling overhead, Mr. Nichols is unable to sit idly by just hope that the Government sends a response.

Aaron Nichols will show that he can overcome the presumption of detention with evidence that he has a suitable 3rd party custodian, minimal criminal history, and that there exists a wide array of available conditions that *reasonably assure* the safety or the public and his appearance in court.  In support, Aaron Nichols states as follows:

## I.    THE STATUTORY PRESUMPTIONS OF DETENTION SHOULD BE VIEWED WITH CAUTION BECAUSE THEY LEAD TO HIGH RATES OF DETENTION FOR LOW-RISK DEFENDANTS.

Congress enacted the statutory presumptions of detention in the Bail Reform Act of 1984 (BRA) "to detain high-risk defendants who were likely to pose a significant risk of danger to the community if they were released pending trial."[1]  But the presumptions of detention have not worked as intended, and federal pretrial detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in 2019.[2]  A recent study by the Administrative Office of the Courts (AO) attributed this "massive increase"[3] in detention rates to the presumptions of detention, especially as they are applied to low-risk defendants.[4]  The statutory presumptions in drug and firearm cases applied to *nearly half* of all federal cases

---

[1] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 FED. PROB. 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B.

[2] *Pretrial Release and Detention: The Bail Reform Act of 1984*, Bureau of Just. Stat. Special Rep., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); *Judicial Business: Federal Pretrial Services Tables*, Admin. Off. U.S. Courts ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019); see also AO Table H-14A (Sept. 30, 2019); https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (61% detention rate *excluding immigration cases*).

[3] Austin, *supra* note 1, at 61.

[4] *Id.* at 57.

each year.[5]  The presumptions of detention have thus become "an almost de facto detention order for almost half of all federal cases."[6]

The study further found that the presumptions increase the detention rate without advancing community safety.  Rather than jailing the worst of the worst, the presumptions over- incarcerate the lowest-risk offenders in the system, people who are stable, employed, educated, and have minimal to no criminal history.[7] When a low-risk individual is not facing a presumption, they're released 94% of the time.[8] Yet an identically low-risk individual in a presumption case is released just 68% of the time.[9]  Recent testimony before Congress relied on this government study to call for reform: "These presumptions must be changed because they've had far-reaching and devastating consequences that were unforeseen and unintended by Congress."[10] Moreover, "[t]he BRA's legislative history demonstrates that Congress did not intend the drug presumption to apply so broadly," and only intended it to apply to "major

---

[5] *Id.* at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").

[6] *Id.* at 61.

[7] *Id.* at 57.

[8] *Id.*

[9] *Id.*

[10] *See The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; *Testimony of Alison Siegler* at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-20191114.pdf; *see also Written Statement of Alison Siegler* at 13–17 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA- 20191114.pdf (calling for the complete elimination of the presumptions in drug and gun cases).

drug traffickers," which may apply to some defendants in this case, but do not apply to people like Aaron Nichols.[11]

Relying on the groundbreaking findings of the AO study, the Judicial Conference's Committee on Criminal Law recently determined "that the § 3142(e) presumption was unnecessarily increasing detention rates of low-risk defendants, particularly in drug trafficking cases."[12] To address this problem, the Judicial Conference proposed significant legislative reform that would amend the presumption of detention in drug cases "to limit its application to defendants described therein whose criminal history suggests that they are at a higher risk of failing to appear or posing a danger to the community or another person."[13] While the Judicial Conference's proposed legislation has not been enacted yet, this Court can certainly take it into account when evaluating the presumption of detention in this case.

Based on the proposed legislation, commentators have urged judges to give "little, if any, weight to the drug presumption of detention at the detention hearing stage."[14] The problems with the statutory presumptions of detention are important to Aaron Nichols' motion because, as the AO study confirms, high federal pretrial detention rates come with significant and wide-ranging "social and economic costs."[15] For example, the study explains

---

[11] Erica Zunkel & Alison Siegler, *The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction*, 18 Ohio St. J. Crim. L. (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3589862, PDF at 7–9 (analyzing legislative history of presumptions in detail).

[12] *Report of the Proceedings of the Judicial Conference of the United States* 10 (Sept.12, 2017), archived at https://perma.cc/B7RG-5J78.

[13] *Id.*

[14] Zunkel & Siegler, *supra* note 11, PDF at 4.

[15] Austin, *supra* note 1, at 61.

that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a defendant towards relapse and/or new criminal activity."[16]

    A.  <u>Pre-Trial Detention Condemns Struggling Families to a Life of Hardship</u>

Indeed, the economic harms stemming from being detained pretrial persist for years. Even three to four years after their bail hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[17]  And these harms are not just limited to the detained person—once someone is incarcerated, the odds that his children become homeless increase by 95%, and the odds that his partner becomes homeless increase by 49%.[18]

Prior to this instant detention, Mr. Nichols was living with his fiancé, Torie McCullough, and their two young children.  The family unit that was in place made use of the income provided by both adults to maintain the household.  If Mr. Nichols were to remain in detention, and therefore be unable to financially aid his family, the family unit that is currently in place could be eviscerated by his disappearance.

---

[16] *Id.* at 53; *see also* Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) Fed. Prob. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[17] Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) Amer. Econ. Rev. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[18] *For* children, Christopher Wildeman, *Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment*, 651 The Annals of the American Academy of Political and Social Science 74, 88 (2014); *for* partners, *see* Amanda Geller & Allyson Walker Franklin, *Paternal Incarceration and the Housing Security of Urban Mothers*, 76 J. Fam. & Marriage 411, 420 (2014).

Importantly, the downstream devastation of detention is far reaching. The consequential effect of losing a financial provider in the home could very well result with not only Mr. Nichols being removed from his home, but statistically could be a driving factor of his fiancé and two children being removed as well. Thrusting families out upon the cold unwelcoming streets of Little Rock flies in direct opposition to the safety of the public.

Evidence reveals that that income inequality is a driving factor of violent crime and homicide.[19] The greater the disparity, the more suffering and violence. *See Id.* Public safety benefits more from keeping families together and incomes stable– not less.

Moreover, the emotional and psychological harms forced upon the children of incarcerated parents is well- documented.[20] With such plentiful evidence, it is unsurprising that another AO study found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[21] More recent studies have confirmed that pretrial detention is criminogenic[22] and cautioned that "lower crime rates should not be tallied as a

---

[19] *See Szalavitz M. Income Inequality and Homicide.* Sci Am. 2018 Oct 16; 319(5):9., https://doi.org/10.1038/scientificamerican1118-9

[20] *See, e.g.,* Joseph Murray et al., *Children's Antisocial Behavior, Mental Health, Drug Use, and Educational Performance After Parental Incarceration: A Systematic Review and Meta-Analysis*, 138(2) Psychological Bulletin 175, 186 (2012).

[21] Austin, *supra* note 1, at 54 (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[22] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic

benefit of pretrial detention."[23]

      One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate.[24]  In Mr. Nichols current location, the Dallas County Jail, which is like most detention facilities in Arkansas, there is a noticeable lack of programs providing rehabilitative therapy for substance abuse disorder. Simply put, jails lack necessary staffing and resources to be a legitimate source of assistance to incarcerated persons.  Instead of receiving help, these individuals are essentially ignored, neglected, and cast away from society.

      In stark contrast to the services provided by county detention facilities, the pre-trial release plan for Mr. Nichols supports substance use rehabilitation through Mr. Nichols' third-party custodian, Ms. Ernestine Thomas.  Ms. Thomas, who is a pastor, by and through her church, has access to community programs and resources that can more appropriately, and far more rapidly, provide the treatment that Mr. Nichol's medical history indicates he requires.

      The increased likelihood of mental health problems is not the only likely outcome of

---

effects."); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Legal Stud. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[23] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & Econ. 529, 555 (2017).

[24] *See* Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Just. Stat., at 9 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 J. Substance Abuse Treatment 239, 247, 249 (2007), archived at https://perma.cc/G55Z-4KQH.

prolonging Mr. Nichols' detention.   In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[25]   These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[26]   In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place.

>   B.   <u>Detention of Mr. Nichols Will Forever Damage Familial Ties</u>

As this Court is keenly aware, a case of this size is not completed in a rapid fashion. Even exercising the diligence and efficiency that is customary our District, it is likely that this case would not conclude for years to come.   And, while the time on the docket ticks, a mother will be left behind to raise two children on her own apart from Mr. Nichols.

When families' members are physically separated from their detained or incarcerated loved ones, maintenance of family bonds is financially and temporally burdensome – especially in Arkansas.[27]   Travelling long distances may be financially out of reach or hair

---

[25] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2014), archived at <u>https://perma.cc/QAW9-PYYV</u>.

[26] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) Fed. Prob. 23, 26 (2018), archived at <u>https://perma.cc/8VM9-JH9T.</u>

[27] Peter Wagner and Alexi Jones, *State of Phone Justice: Local jails, state prisons and private phone providers*, Prison Policy Initiative, February 11, 2019, availalable at https://www.prisonpolicy.org/phones/state_of_phone_justice.html (Noting that as cost of calls and telecom infrastructure has decreased, cost of making calls in state has increased significantly due to "fees" and hidden charges.).

raising when performed by a single parent with an entourage of small children.[28]  Ultimately, because of the distance and complexities of prison visitation – the net effect is that individuals who are detained see fewer visits the further away from home they go.[29]  As the miles separating families increase, families routinely try and turn to telephone communication to keep in contact.  Unfortunately, the communication systems are nothing short of many of them rely strictly on telephonic communication to maintain some semblance of contact

Detention facilities in Arkansas utilize systems that make contacting family difficult and exorbitantly cost prohibitive.  To wit, in the Dallas County facility where Mr. Nichols is currently housed, speaking with one's children and family consumes a financially crushing $12.60 per hour, a figure that exceeds the median hourly take home pay of most Arkansans.[30][31]  If you wanted to view your loved on a video call, you should be ready to fork out at least $18.00 an hour for that privilege.[32]  Struggling families fighting against societal odds shouldn't be pinned to the wall and forced to choose between being able to afford food on the table or having Daddy say, "Good Night."

---

[28] Counsel in this matter notes that the IRS mileage rate from Little Rock, Arkansas to the Dallas County Jail is approximately 138 MILES round trip, resulting in an expense of $86.50.

[29] Clark, V. A., & Duwe, G. (2017). Distance Matters: Examining the Factors That Impact Prisoner Visitation in Minnesota. *Criminal Justice and Behavior*, *44*(2), 184–204. https://doi.org/10.1177/0093854816667416

[30] Dallas County Sheriff Department, *General Information*, accessed on November 27, 2022, and available at https://www.dallascountyarsheriff.com/general-5.

[31] https://www.census.gov/quickfacts/AR  (showing median household income

[32] Dallas County Sheriff Department, *General Information - 5*, accessed on November 27, 2022, and available at https://www.dallascountyarsheriff.com/general-5 (indicating cost per minute on video visit is .30 cents per minute.

When family members are removed and denied contact, the results of that action are seen for years to come.  Evidence demonstrates that when compared to their peers with two-parents, children of single parents perform more poorly in their school academics.[33]  They experience more trauma and stress while learning to be adults as they suffer from a greater frequency of emotional and behavioral problems;[34] a fact which is especially true for young males.[35]  The interests of public safety are not just current interests, but also the future interests in safety and wellbeing of the community.   That keeping Mr. Nichols locked away for the pendency of this trial appears to strain credulity.  The societal harm perpetuated by his detention far outweighs the minimal risk of his supervised release.

Lastly, there are also significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[36] Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day.[37] This means that even if this case were to rapidly conclude within a single year – the government still saves over $24,090.00 with Mr. Nichols on pre-trial supervision.   The

---

[33] Aurora P. Jackson et. al., *Single Parenting and Child Behavior Problems in* Kindergarten, Race Soc. Probl. 2010 Mar; 2(1):50-58. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3193152/
[34] J. J. Clark et al., *Emotion and behavioural problems experienced by children living in single-parent families: a pilot* study, J. Paediatr. Child Health, October (1993), 338, 343, and available at https://pubmed.ncbi.nlm.nih.gov/8240860/.
[35] *Id.*
[36] Austin, *supra* note 1, at 53.
[37] *Id.* Thus, 255 days of pretrial detention would cost taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time would cost an average of $1,785.

misapplication of public funds to detain individuals who pose minimal risk of harm or flight is contrary to 18 U.S.C.S. § 3142 and the economic interest of the public.

    C.   <u>Aaron Nichols Should Be Released on Bond with Conditions.</u>

This Court should release Aaron Nichols with conditions. In this case, the statute creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C.S. § 3142(e)(3). However, release is warranted here because there are numerous facts under § 3142(g) that rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure Aaron Nichols' appearance in court and the safety of the community.

As the Supreme Court held in *Salerno*, "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 754-55, 107 S. Ct. 2095, 2105 (1987). This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances.

Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. 18 U.S.C.S. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur, 817 F.2d* 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), as reprinted

in 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

Having negotiated bond for many of the co-defendants in this matter, many with sufficiently greater charges and prior history under this same indictment, the Government appears to have taken a no-holds barred approach to Mr. Nichols release from detention. Instead of negotiating for "reasonable assurance" the Government appears to demand something more akin to a "Money-back guarantee." Such a demand conflicts with standard imposed under 18 U.S.C.S. § 1342. *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985)(finding that a District Court's detention order that requiring safeguards to "guarantee" no infliction of harm and defendant's appearance was an improper requirement imposed in violation of the Bail Reform Act of 1984.). Notably, the only conditions that can be imposed to Mr. Nichols are the minimum conditions necessary to ensure public safety and the defendant's appearance at trial. Anything beyond that threshold is unconstitutional. S*tack v. Boyle*, 342 U.S. 1, 3, 72 S. Ct. 1, 3 (1951) (finding that conditions of bail that exceed that reasonably calculated to fulfill the purpose of assuring the presence of the defendant is "excessive" under the Eighth Amendment).

## II.  THE PRESUMPTION OF DETENTION CAN BE EASILY REBUTTED AND, ONCE REBUTTED, MUST BE CONSIDERED ALONGSIDE ALL OF THE EVIDENCE THAT WEIGHS IN FAVOR OF RELEASE.

The law is clear that (1) very little is required for a defendant to rebut the presumption, and (2) courts must weigh the rebutted presumption against every factor that militates in favor of release before detaining a defendant. In addition, it is impermissible to detain a defendant in a presumption case based solely on evidence of past dangerousness, the

nature of the crime charged, or the weight of the evidence.

A.     <u>Rebutting the Presumption is a Minor Burden</u>

Very little is required for a defendant to rebut the presumption of detention. "In a presumption case such as this, a defendant bears a limited burden of production--not a burden of persuasion--to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight." *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (quoting and finding to be instructive *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *see also United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1–2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States* v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985)).

Courts in our Circuit have frequently looked to instructive cases originating from other circuits, one particularly referenced in 18 other cases within the 8th Circuit is *United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986).

In *Dominguez*, the Seventh Circuit determined that the defendants had sufficiently rebutted the presumption of detention by introducing minimal evidence about their employment and family ties. *Dominguez,* 783 F.2d at 707.  Both defendants were Cuban immigrants who were not U.S. citizens but had been in the country lawfully for five years, and neither had a criminal record. *Id.* One of the defendants was married and had family members in the United States; both

were employed. *Id.* These facts alone were sufficient for the Seventh Circuit to find that defendants had rebutted the presumption. *Id.*

Importantly, if a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is definitively rebutted. *Id.* ("Once this burden of production is met, the presumption is 'rebutted.'")(*quoting United States v. Jessup*, 757 F.2d 378, 384 (1ST Cir. 1985); *see also United States v. O'Brien*, 895 F.2d 810, 810 (1st Cir. 1990) (finding presumption of flight risk rebutted by evidence of effectiveness of electronic monitoring ankle bracelet together with posting of defendant's home[38] The government bears the burden of *persuasion* at all times. *Id.*; *Jessup*, 757 F.2d at 384; *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

B. <u>Weighing the Rebutted Presumption</u>

After the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics that tilts the scale in favor of release. *See United States v. Abad*, 350 F.3d 793, 797 (8th. Cir. 2003) (Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the

---

[38] To rebut the presumption of flight risk, for example, a defendant does not "have to *prove* that he would not flee—*i.e.*, he would [not] have to *persuade* the judicial officer on the point. [Instead], he would only have to introduce a certain amount of evidence contrary to the presumed fact." *Jessup*, 757 F.2d at 380–81; *accord Dominguez*, 783 F.2d at 707.

district court.).  The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors support release.

      C.   <u>Forbidden Considerations in a Presumption Case</u>

A judge may not detain a defendant in a presumption case based solely on (1) evidence of past dangerousness, (2) the nature and seriousness of the crime charged, or (3) the weight of the evidence against him. First, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Dominguez*, 783 F.2d at 707.  Even when a defendant is charged with a serious crime or has a significant criminal history, there may be release conditions that will reasonably assure the safety of the community. *Id.* Second, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking] is not dangerous to the community." *Id.* at 706.  Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Third, the Court is forbidden from relying solely on the weight of the evidence to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.*

## III.    THE PRESUMPTION OF DETENTION IS REBUTTED IN THIS CASE

As detailed below, there is more than just some evidence in this case that demonstrates the existence of conditions that will reasonably assure the safety of the

community and Mr. Nichols' appearance before this court.; *see Mercedes*, 254 F.3d at 436; *see also United States v. Kisling*, 334 F.3d 734 (8th Cir. 2003). Accordingly, the presumption is rebutted in this case.

In any event, to place the issue squarely before this Court, Aaron Nichols presents the following evidence:

A.   <u>Mr. Nichols Has Deep Roots In Arkansas</u>

Mr. Nichols is a long-time resident of Little Rock, Arkansas. Mr. Nichol's fiancé, Tori McCullough, also resides here in Little Rock. Mr. Nichols has two young children, they too, reside in Little Rock, Arkansas. Mr. Nichols has a significant interest in spending time with his children, experiencing holidays with them, particularly Christmas. Importantly, Mr. Nichols has a grandmother and grandfather who both also live in Arkansas.

B.   <u>Mr. Nichols Is Not Sitting Idly Unemployed</u>

Mr. Nichols has operated a dispatching service for trucking and hauling. Should this vocational endeavor be sufficient to this Court, Mr. Nichols would continue this. However, Mr. Nichols suggested third party custodian has also indicated that she has employment readily available for Mr. Nichols that would be of benefit to him and to the church that would employ him.

C.   <u>Mr. Nichols Needs to Work and Doesn't Have Resources to Abscond</u>

Mr. Nichols is not independently wealthy. He works to earn to survive and does not have a vast wealth that could be utilized to abscond or evade law enforcement. While employed, he has sufficient capital to help maintain a household.

16

D.    Mr. Nichols' Past Is Dissimilar To Those Who Should Be Detained

Mr. Nichols' past criminal record is minimal.  Mr. Nichols readily admits that he has been in trouble for charges related to substance abuse from as early as 2012, when he was 22 years old.  Mr. Nichols has been sentenced to probation three separate times – none of those periods of probation were revoked.  Mr. Nichols has not been charged, convicted, or otherwise accused of **any** crimes involving the use of force or threatened force against another person.  He has a longstanding history of being a non-violent person.  To the extent that Government would posit to argue that Mr. Nichols previously possessed a firearm, and by that possession alone Mr. Nichols would note that Arkansas has a long-standing history of bearing arms for self-defense, with nearly fifty percent of adult Arkansans owning firearms.[39]

There government has yet to prove their case, but what can be shown is that within the same household as Mr. Nichols, were other adults of sufficient age, who could lawfully possess firearms, and lawfully owned firearms – specifically a small pink handgun.   Importantly, the government has put forth no evidence that Mr. Nichols carried and used a firearm during the course of a drug transaction.  Such speculative factors have previously been considered in this circuit and ultimately were insufficient to detain an individual without bond. *See United States v. Cirksena*, 749 F. App'x 488, 490 (8th Cir. 2019) (indicating that whether a weapon was actually used during the course of drug trafficking as relevant and finding that the alleged possession of the firearm and charges of controlled substance possession were insufficient to detain the defendant.).

---

[39] Rand Corporation, *Gun Ownership In America*, accessed on November 27, 2022, and available at https://www.rand.org/research/gun-policy/gun-ownership.html (showing data estimates that at least fifty-percent of Arkansas adults own a firearm.

Unfortunately, the Government will also likely attempt to masquerade Mr. Nichols alleged possession of a firearm in October 2021 as being inherently dangerous to the public. The facts, however, are entirely contrary and were entirely predictable from the outset of the government's actions.

    E.   <u>Preparing to Defend Your Castle is a Lawful Response to a Midnight Invasion</u>

Arkansas' constitution provides that its citizens have a "right to keep and bear arms, for their common defense." Ark. Const. art. ii, § 5.   Additionally, the home is where need for defense of self, family, and property is most acute. *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008).   Such a fact is also recognized and further codified in Arkansas law under A.C.A. § 5-2-620, stating that:

> The right of an individual to defend himself or herself and the life of a person or property in the individual's home against harm, injury, or loss by a person unlawfully entering or attempting to enter or intrude into the home is reaffirmed as a fundamental right to be preserved and promoted as a public policy in this state.

The citizens of Arkansas have a **firm** belief in defense of the castle.   In fact, this exact position is codified right into Arkansas law, which provides that even individuals who may be prohibited from the ownership of firearms, can utilize those same weapons in defense of their home. *See* A.C.A. § 5-2-607 (authorizing an individual who is prohibited from possession of a firearm under A.C.A. § 5-73-103 to utilize deadly force with a firearm when "the person is in or at the person's dwelling or in the curtilage surrounding the person's dwelling.").

With this backdrop in mind, the Government knowingly and purposefully requested from a Federal Judge that they be able to surprise the occupants of Mr. Nichols residence in the wee hours of the morning with their warrant.  And after getting approval, surprise is exactly what they

did when they shattered through the front door of the apartment causing panic and disorder. Under such circumstances, it's unimaginable that occupants of a home being subjected to an unexpected siege would not be struck with terror, fear, and uncertainty.

What is a father to do when they are violently awakened, confused, and then fueled with adrenaline by a significant other screaming that someone is breaking into your home?  They do exactly what every is bound to by duty: Protect the family.  The government's view of the events that took place, along with Mr. Nichols' intent and actions is simply upside down and backwards. The Court should rightfully disregard such fiction and instead take note that Mr. Nichols was rapidly awakened, engaged in his moral duty to protect his family, and ***immediately*** obeyed the directions of law enforcement once the mistake was realized and clarity as to who was smashing into a home in the early hours of the morning was made clear.

F.   <u>A Single Failure To Appear Does Not Accurately Reflect Mr. Nichols Ability and Commitment To Appear Before This Court.</u>

The Government, following a stale, six-year-old failure to appear for a traffic offense, will likely attempt to take the position that the Mr. Nichols of today is not able to make it to Court and would otherwise be a danger to not appear.  Such an argument is simply a red herring.  The traffic matter from England, Arkansas is entirely dissimilar to the situation today.  Having six more years of experience since that incident, Mr. Nichols is currently fully aware and conscious of the severity and serious nature of the case brought against him.  Mr. Nichols record demonstrates that he has had no issues facing matters of which he was informed – and this case will be no different.  Additionally, Mr. Nichols is represented by Counsel who can aid him with reminders to appear, which are done by phone, e-mail, text and in person meetings.

G.   Mr. Nichols Needs Treatment Not Detention

Mr. Nichols admits that he has a history of substance use.  This is importantly why within the plan submitted for Mr. Nichols pre-trial release, counseling and therapy has been identified as a recommended action.   Conditions exist in pre-trial release that will benefit and help treat the substance use.  Because of this, the prior history should not operate as a bar to release.

The foregoing facts definitively rebut the presumption of detention in this case.

IV.   **REGARDLESS OF THE PRESUMPTION, AARON NICHOLS MUST BE RELEASED BECAUSE THERE ARE CONDITIONS THAT WILL REASONABLY ASSURE APPEARANCE AND SAFETY.**

Regardless of whether this Court finds that the presumption of detention is rebutted, Aaron Nichols must be released because there are conditions that will reasonably assure the safety of the community and his appearance in court. A defendant cannot be detained "unless a finding is made that no release conditions '*will* reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *Dominguez*, 783 F.2d at 707 (quoting 18 U.S.C.S. § 3142(e)). Here, the government has not carried its high burden of proving by clear and convincing evidence that there are *no* release conditions that will reasonably assure the safety of the community. *Kisling*, 334 F.3d at 735. The government also has not proved by a preponderance of the evidence that there are no conditions that would reasonably assure Mr. Nichols appearance in court.  Because the Government has failed on both points, Aaron Nichols cannot be detained.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure Mr. Nichols' appearance in court and the

safety of the community:

1. Place Aaron Nichols in custody of third-party custodian who agrees to assume supervision and to report any violation of a release condition to the court;

   a. Mr. Nichols has indicated and submitted to the government an appropriate 3rd party custodian.  Ms. Thomas is a pastor at a local church.  Ms. Thomas has no criminal background.  There is room availability in her home and Mr. Nichols presence would not be a burden to her.  Ms. Thomas has reliable transportation and can aid Mr. Nichols in getting to his appointments and court.   Additionally, Ms. Thomas has access to resources for drug treatment and counseling through her church that will be of benefit to Mr. Nichols.

2. Maintain or actively seek employment;

   a. Mr. Nichols agrees to seek and maintain gainful employment while on release.  Ms. Thomas has previously informed Mr. Nichols that there is available employment under her direction at the church.

3. Follow restrictions on "personal associations, place of abode, or travel."

   a. Mr. Nichols agrees to not have contact with co-defendants or persons otherwise associated with the instant matter.

4. Report on a "regular basis" to PTS or some other agency.

   a. Mr. Nichols will check in as required with Pre-Trial Services and his Attorney.

5. If necessary, Mr. Nichols will comply with a court-imposed curfew.

6. Neither Ms. Thomas, her husband, or Mr. Nichols will have or maintain possession of a firearm within the home.

7. Mr. Nichols will abide by any other condition that is reasonably necessary to assure the appearance of his person as required and to assure the safety of any other person and the community.

Because there are conditions of release that will reasonably assure Mr. Nichols appearance in

court and the safety of the community, he should be released.

## V.    STATISTICS SHOWING THAT IT IS EXTRAORDINARILY RARE FOR DEFENDANTS ON BOND TO FLEE OR RECIDIVATE FURTHER

**DEMONSTRATE THAT THE FOREGOING CONDITIONS OF RELEASE WILL
REASONABLY ASSURE APPEARANCE AND SAFETY.**

It is not necessary to detain Aaron Nichols to meet the primary goals of the BRA, which are to reasonably assure appearance in court and community safety. In this case, this Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and 98% did not commit new crimes on bond.[40] Moreover, when release rates increase, crime and flight do not. A near-perfect compliance rate on bond is seen equally in federal districts with very high release rates and those with very low release rates.[41] Even in districts that release two-thirds of all federal defendants on bond, fewer than 1% fail to appear in court and 2% are rearrested while

---

[40] App. 1, AO Table H-15 (Dec. 31, 2019), *available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[41] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. *See* App. 2, AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42. The failure-to-appear and rearrest rates for these districts were calculated using App 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 26.00%) have an average failure-to-appear rate of 1.37%, while the ten districts with the highest release rates (average 65.58%) have an *even lower* failure-to-appear rate of 0.87%. *See* App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 1.19%, while the ten districts with the highest release rates have an average rearrest rate of 2.29%. *See* App. 1; App. 2. The districts with the lowest release rates are, from lowest to highest, S.D. California, W.D. Arkansas, E.D. Tennessee, S.D. Texas, E.D. Missouri, N.D. Indiana, E.D. Oklahoma, W.D. Texas, W.D. North Carolina, C.D. Illinois; the districts with the highest release rates are, from lowest to highest, E.D. Michigan, E.D. Arkansas, D. New Jersey, E.D. New York, D. Maine, D. Connecticut, W.D. New York, W.D. Washington, D. Guam, D. Northern Mariana Islands. *See* App. 2.

released.[42]  The below chart reflects this data:

The bond statistics for this district likewise strongly suggest that Aaron Nichols should be released.  In this district, released federal defendants appeared for 95.6% of the time in 2019, and only 5.5% of defendants were rearrested on release.  *See* App. 1, AO Table H- 15.



Yet despite the statistically low risk of flight and recidivism that defendants like Aaron Nichols pose, the government recommends detention in 77% of cases nationwide and 64% of cases in this district.  *See* App. 3, AO Table H-3.  Clearly the government's detention requests are not tailored to the low risk of flight and recidivism that defendants in this district and elsewhere pose.

Aaron Nichols must be released because the government has not established that he would be among the approximately 4% of defendants who fail to appear in court or the 5% who are rearrested on bond.  Detaining Aaron Nichols without such evidence constitute an injustice and is a violation of his Eight Amendment Rights.

---

[42] *See* App. 1; App. 2.

## VI.   A Logical Conclusion Follows: Mr. Nichols Should Not Be Detained.

The Government has not come close to demonstrating the non-existence of a condition that will reasonably assure the presence of Aaron Nichols and the reasonably assure the safety of the public.   Considering the substantial evidence presented contrary to the government position, and the variety of imposable conditions, only one decision from this detention rises to the level of clear and convincing:

Mr. Nichols should go home for the holidays.

Respectfully submitted,

/s/ Christopher H. Baker
Christopher H. Baker, Esq.
Arkansas Bar No. 2022124
*Attorney for Aaron Nichols*
James Law Firm
1001 La Harpe Blvd.
Little Rock, Arkansas 72201
Telephone: (501) 375-0900
Email: Chris@Jamesfirm.com

# APPENDIX 1

## AO TABLE H-15 (Dec. 31, 2019)

*available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis.

Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H

# APPENDIX 2

**AO TABLE H-14A (Dec. 31, 2019)**
https://perma.cc/32XF-2S42

# APPENDIX 3

## AO TABLE H-3 (Sept. 30, 3019)

https://www.uscourts.gov/sites/default/files/data_tables/jb_h3_0930.2019.pdf

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of defendant Aaron Nichols' Brief in Support of his Motion for Pretrial Release In Presumption Cases was electronically filed and served on the Court's electronic filing system.  A copy of the filing will be mailed to any parties not associated with CM/ECF filing system.


Dated: November 27, 2022                        /s/ Christopher Baker
                                                Christopher H. Baker, Esq.
                                                Arkansas Bar No. 2022124
                                                Attorney for Aaron Nichols
                                                James Law Firm
                                                1001 La Harpe Blvd.
                                                Little Rock, Arkansas 72201
                                                Telephone: (501) 375-0900
                                                Email: Chris@Jamesfirm.com